# United States District Court

__WESTERN__ DISTRICT OF __NEW YORK__

UNITED STATES OF AMERICA
v.

YEONG C. LIN

**CRIMINAL COMPLAINT**

CASE NUMBER: 05-M – *4095*

I, Mark Thompson, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From in or about December 1999 continuing up to in or about December 2001, in the Western District of New York, the defendant, and others known and unknown, conspired to knowingly take, and to knowingly possess without authorization, with the intent to convert, a trade secret, to the economic benefit of anyone other than the owner thereof, and intending that the offense would injure the owner of that trade secret, in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(3), and (a)(5).

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof:   (✔) Yes   ( ) No

*[FILED stamp: 05 OCT 31 PM 3:00 U.S. DISTRICT COURT WDNY ROCHESTER]*

MARK THOMPSON, Special Agent, FBI
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 31, 2005                     at     Rochester, New York
Date                                          City and State

HON. MARIAN W. PAYSON
United States Magistrate Judge

Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

State of New York)
County of Monroe )   SS:
City of Rochester)

Mark Thompson , being duly sworn, deposes and says that:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for over 17 years, duly appointed according to law and acting as such.

2. I am presently assigned to the Elmira Resident Agency of the FBI, and I am authorized to investigate, among other things, matters involving theft of trade secrets in violation of Title 18, United States Code, Section 1832.

3. I am familiar with the information contained in this complaint either through personal investigation or conversations with other individuals involved in this investigation, including examination of various documents.

4. Because this complaint is being submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I learned in connection with this investigation.

1

**Relevant Parties and Entities**

5. PicVue Electronics, Ltd. (hereinafter "PicVue") is a Taiwanese corporation based in Taiwan.

6. Corning Incorporated (hereinafter "Corning") is a corporation based in the Western District of New York.

7. Saint-Gobain Advanced Ceramics Corporation (hereinafter "Saint-Gobain") is a corporation based in the Western District of New York.

8. JONATHAN SANDERS was an employee of Corning, based in Harrodsburg, Kentucky plant.

9. DANNY PRICE is a former college room-mate of Dr. Yeong C. Lin.

10. At all relevant times, DR. YEONG C. LIN, who resides in California, worked as a consultant for PicVue beginning in 1999 and continuing until the early part of 2005.

## Overview

11. Based on the evidence set forth below, there is probable cause to believe that from in or about December 1999 and continuing up to and including in or about December 2001, the defendant DR. YEONG C. LIN (hereinafter "LIN"), and others known and unknown, conspired to knowingly take, and to knowingly possess without authorization, the trade secret of Corning involving the overflow down draw fusion process to produce Thin Filter Transistor (TFT) Liquid Crystal Display (LCD) glass, with the intent to convert that secret to the economic benefit of PicVue, and intending that the offense would injure Corning, all in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(3), and (a)(5).

## Facts Establishing Probable Cause

12. Corning has a long history of producing glass, and it produces TFT LCD glass using the overflow down draw fusion process. The TFT LCD glass produced by Corning is a product produced for and placed in interstate and foreign commerce.

13. PicVue is in the business of "back-end" operations for LCD glass, that is the cutting of larger sheets of glass into smaller sheets as well as cleaning and inspection, and does not make its own glass.

14. In the late 1990s, PicVue decided to go into the TFT glass market and started looking for resources to help it get into the manufacturing of TFT glass.

15. This investigation began as a result of PicVue's visit to the Western District of New York in September 2001. In September 2001, representatives from PicVue went to visit with representatives of Saint-Gobain at Saint-Gobain's offices in Niagara Falls, New York, in the Western District of New York. The purpose of the visit was to arrange to purchase Hexoloy, Saint-Gobain's silicon carbide product which is a key component to the overflow down draw fusion glass-making machine. Saint-Gobain has a relationship with Corning and was familiar with Corning's overflow down draw fusion glass-making machine.

16. During PicVue's visit to Niagara Falls in September 2001, PicVue's representatives showed Saint-Gobain's representatives some drawings that appeared to Saint-Gobain to be similar to drawings used by Corning in its overflow down draw fusion glass-making machine.

17. As PicVue's engineers began working with Saint-Gobain's engineers, and sent more of PicVue's purported drawings to

the Western District of New York for Saint-Gobain's review, Saint-Gobain recognized that the drawings were very similar to drawings used by Corning, and became concerned that PicVue was in possession of Corning's trade secret material.

18. Corning experts thereafter had an opportunity to review the drawings sent by the PicVue engineers to Saint-Gobain and recognized the drawings to contain certain trade secret material belonging to Corning as it involved the overflow down draw fusion glass-making machine.

19. On or about October 13, 2005, I participated in a deposition of Dr. Jacob W. Lin, the former president of PicVue. Dr. Jacob Lin described how PicVue's engineers came into possession of Corning's materials.

20. According to Dr. Jacob Lin, PicVue had a consultant based in California, LIN. In December of 1999, LIN arranged for representatives from PicVue, including Dr. Jacob Lin, to meet with Sanders, a Corning employee based in Kentucky.

21. In December 1999, representatives from PicVue met with Sanders in the Central District of California. Sanders had brought with him to the meeting what looked like a roll of

drawings, however none of the drawings were shown at that time to the PicVue representatives. During the meeting, Sanders explained Corning's overflow down draw fusion glass-making process to the PicVue representatives.

22. In early 2000, PicVue representatives, including Dr. Jacob Lin, traveled to the Eastern District of Kentucky to meet with Sanders to offer him a job with PicVue in Taiwan.

23. Sometime between January 2000 and September 2000, Sanders decided not to accept the job offer from PicVue to work in Taiwan.

24. In 2000, PicVue formed PicVue Optoelectronics for the purpose of manufacturing TFT LCD glass.

25. Sometime prior to September 2000, PicVue was informed by LIN that Sanders was offering to PicVue, drawings he had obtained from Corning. PicVue authorized payment in exchange for the drawings. According to Dr. Jacob Lin, he assumed that the drawings were material from Corning and he assumed that the drawings were being offered without Corning's authorization. A wire transfer of approximately $30,000 was made to an account in California.

26. The money was transferred to LIN who arranged for the money to be delivered to Sanders. LIN provided the money to an acquaintance, DANNY PRICE, who arranged to meet Sanders outside of Atlanta, Georgia. DANNY PRICE took the money and met Sanders near Atlanta. Sanders provided the DANNY PRICE with a roll of blueprints that he had stolen from Corning and Sanders accepted $25,000 as payment for the blueprints. The Corning blueprints were then transferred to DANNY PRICE.

27. In September 2000, LIN met with engineers from PicVue in California and he brought with him the Corning blueprints. The PicVue engineers photographed with a digital camera the blueprints that had been provided by Sanders. The photos were then downloaded to a disk that was taken back to Taiwan by the PicVue engineers. LIN destroyed the original Corning blueprints.

28. Sometime in November 2000, engineers from PicVue met with Sanders in the Eastern District of Kentucky. At the November 2000 meeting, the engineers from PicVue asked Sanders questions they had regarding the blueprints that he had taken from Corning and subsequently sold to PicVue.

29. The PicVue engineers were instructed by PicVue management to be careful not to divulge the existence of the Corning blueprints to anyone else. Sometime in April 2001, a copy of the disk containing the Corning blueprints was destroyed by PicVue.

30. On or about October 18, 2005, I interviewed Sanders in Harrodsburg, Kentucky. Sanders confirmed that he had sold Corning's blueprints to PicVue. According to Sanders, he found the blueprints in Corning's Harrodsburg warehouse in a hopper containing confidential material to be destroyed. He took the blueprints from the trash hopper and removed them from Corning's property. When Sanders rejected PicVue's job offer, he offered the blueprints to PicVue through LIN. Sanders stated that LIN made the arrangements for the purchase of the blueprints.

31. In addition, Sanders stated that he had received an additional payment of $9,000.00 from PicVue in exchange for an additional, smaller group of blueprints. The payment for this smaller group of blueprints had been made in the same manner as the $25,000 payment.

32. Sanders stated that he knew it was wrong to take the

blueprints from Corning and he stated that he had no excuse for his actions.

Wherefore, based on the foregoing, your affiant seeks a criminal complaint and arrest warrant against DR. YEONG C. LIN charging him with conspiring with others known and unknown to knowingly take, and to knowingly possess without authorization, the trade secret of Corning involving the overflow down draw fusion process to produce Thin Filter Transistor (TFT) Liquid Crystal Display (LCD) glass, to the economic benefit of PicVue, and intending that the offense would injure Corning, all in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(3), and (a)(5).

MARK THOMPSON, Special Agent
FBI

Sworn before me this
31 day of October, 2005

HON. MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE